FILED
United States Court of Appeals
Tenth Circuit

July 1, 2026

Christopher M. Wolpert
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

    No. 25-5057

KYLE QUENTIN SAGO,

    Defendant - Appellant.

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. Nos. 4:23-CV-00492-GKF-MTS & 4:20-CR-00094-GKF-1)**

_____

Timothy C. Kingston of the Law Office of Tim Kingston, Foley, Alabama, for Defendant-Appellant.

Steven J. Briden, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **MATHESON** and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

    Kyle Quentin Sago shot and killed Daniel Morgan, who was unarmed.

He admitted to the shooting during his testimony at trial. A jury convicted

him of first-degree murder and other crimes related to the shooting. His convictions and sentence were affirmed by this court on direct appeal.

Sago then brought a motion in the district court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, asserting his trial counsel was ineffective. The district court denied his motion. Sago petitioned this court for a certificate of appealability (COA), which was granted on one claim: whether trial counsel was ineffective for conceding guilt against Sago's wishes resulting in a failure to subject the prosecution's case to a meaningful adversarial testing process. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

The factual background of this case is detailed in this court's prior opinion on Sago's direct appeal. *See United States v. Sago*, 74 F.4th 1152, 1154–55 (10th Cir. 2023). We will briefly recount the facts that are relevant to this § 2255 appeal.

On July 25, 2020, Sago reconnected with Daniel Morgan, a man he lived with for a few years as a teenager. *Id.* at 1154. He drove to a home Morgan was staying at in Tulsa, Oklahoma and visited with Morgan for several minutes. *Id.* Sago departed on good terms but returned to the home a few hours later for reasons that are unclear. *Id.* Once he arrived, he called Morgan's cell phone repeatedly. *Id.* Morgan's girlfriend answered and told

2

Sago that Morgan was asleep. *Id.* at 1154–55. He asked Morgan's girlfriend to wake Morgan because he wanted to talk to him. *Id.* at 1155. Sago waited in his vehicle. *Id.* According to Sago, when Morgan woke up and came out from his home, Morgan threw his phone on the ground, seemed angry, and began to approach Sago's vehicle. *Id.* Sago shot at Morgan several times, hitting him once in the chest and three times in the back as Morgan ran away. *Id.* Sago testified at trial to these facts and that, at the time of the shooting, he was afraid Morgan may have been armed. *Id.*

Sago was indicted and charged with one count of first-degree murder in Indian Country, 18 U.S.C. §§ 1151, 1153, 1111. Sago eventually entered a plea of guilty to the lesser included offense of second-degree murder as part of a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). At the scheduled sentencing, the district court rejected the plea agreement because it concluded the underlying facts met the premeditation element of first-degree murder and so "the settlement . . . that was effectuated was the rock bottom" of penalties Sago could face. R. I at 256–57. The district court then asked if, considering its decision to reject the plea agreement, Sago wanted to withdraw his guilty plea. Sago confirmed that he did.

After Sago withdrew his guilty plea, a grand jury returned a superseding indictment. Sago was charged with four counts: (1) first-degree

3

murder in Indian Country, 18 U.S.C. §§ 1151, 1153, 1111; (2) felon in possession of ammunition, 18 U.S.C. §§ 922(g)(1) & 924(a)(2); (3) felon in possession of ammunition, 18 U.S.C. §§ 922(g)(1) & 924(a)(2); and (4) causing death by using and discharging a firearm during and in relation to a crime of violence, 18 U.S.C. §§ 924(c)(1)(A) & 924(j)(1).

At the pre-trial conference, Sago's defense counsel requested a jury instruction for the lesser included offense of second-degree murder, which the district court approved. Defense counsel also moved the court to reconsider its prior decision to reject the plea agreement, which the district court denied. The case then proceeded to a three-day jury trial.

Opening statements occurred on the first day of trial, September 20, 2021. During his opening, defense counsel said:

> [DEFENSE COUNSEL]: Everything the government just told you is true. This is not a case of a who-done-it. There's not going to be any question that Mr. Sago was the shooter that day. The issue for you in this trial is going to be whether or not it was first-degree murder versus a second-degree murder[.]
>
> * * *
>
> Your job's going to be from the facts that are presented from this witness stand, do they support that Mr. Sago had premeditation and he went over there that day with the intent of killing the victim or was it the result of something happened after they got there?
>
> * * *

4

> We believe that after you hear all the facts, see all the actions of all the parties involved, you'll make the determination that this was a second-degree murder.

Op. Br. Attachment 4 at 18–19.

Sago testified in his own defense on the third and last day of trial, just prior to the closing arguments. During the direct examination, he admitted to being convicted of the prior felonies as set out in the indictment's felon-in-possession charges, which was also subject to a stipulation. He also testified that he shot Morgan:

> [SAGO]: When I seen him throw down the phone and start coming out me, I pulled out the – pulled out my gun and I fired a shot which missed him. He seemed like he didn't even notice that I fired a gun. He just kept on coming, he was charging at the car. So this time I decided – I aimed and I fired and I hit him and he just kept on coming. He just kept on coming. He kept on coming all the way up to my car. I was firing several more shots after this and he just kept on coming.
>
> * * *
>
> [DEFENSE COUNSEL]: Why did you shoot him again?
>
> [SAGO]: I was scared.
>
> [DEFENSE COUNSEL]: Scared of what?
>
> [SAGO]: Scared he's going to kill me.

Op. Br. Attachment 6 at 78–79.

The Government then cross examined Sago. During a break from testimony and outside the presence of the jury, the district court sua sponte raised to the parties that it may be appropriate to include a self-defense

5

jury instruction. The district court's law clerk asked the district court if it wanted to address a related lesser included instruction and the district court said, "No. It's got to be requested." *Id.* at 94. Once the cross examination resumed, Sago again admitted to shooting Morgan, including shooting him several times while he was running away:

> [GOVERNMENT]: You also agree with me that what you did do was to shoot Daniel in the chest; correct?
>
> [SAGO]: Yes.
>
> [GOVERNMENT]: You also agree with me that you turned – as Daniel turned, ran away, you shot him in the back and then you shot him again and then you shot him again and then you shot at him again hitting the truck; correct?
>
> [SAGO]: Yes.
>
>               * * *
>
> [GOVERNMENT]: We agree that you shot and killed Daniel; correct?
>
> [SAGO]: Out of fear, yes, correct.
>
> [GOVERNMENT]: Out of fear of what?
>
> [SAGO]: Of my life.

*Id.* at 95–96.

At the conclusion of Sago's testimony, the district court informed the parties outside the presence of the jury that it was adding a self-defense instruction. Once the jury returned, the parties proceeded to make their closing arguments. During his closing argument, defense counsel said:

[DEFENSE COUNSEL]: Yesterday morning when I gave my opening statement, I told you that this was not going to be a who-done-it, that this was going to be a case for you to decide the degree of murder. [Defense counsel discusses inconsistencies in the evidence, goes over Sago's account of the shooting, how evidence shows there was something odd or violent going on in Morgan's home.]

\* \* \*

But if you believe that it was unreasonable for [Sago] to believe he needed to use self-defense, if you believe that he wasn't being threatened with unlawful force from Daniel, I believe it reinforces that [Sago]'s proper punishment should be a second-degree murder, not first-degree.

\* \* \*

And if you don't believe the self-defense, that's our desire is for you to find him guilty of second-degree, which fits the law in this case.

*Id.* at 108–114.

The jury returned a verdict that same day and found Sago guilty on all counts. The district court later sentenced Sago to life imprisonment for the first-degree murder and discharge of a firearm counts, running consecutively to a sentence of 120 months' imprisonment for the unlawful possession of ammunition counts.

Sago filed a direct appeal, where he argued the district court erred when it did not sua sponte include an imperfect self-defense instruction. This court reviewed for plain error and affirmed, holding that there was no error because that instruction is not required unless expressly requested by the defendant. *Sago*, 74 F.4th at 1160.

7

This court also held that Sago failed to satisfy the third prong of plain error (error affected substantial rights) because of the ample evidence in favor of the jury's verdict – there was no evidence the victim was about to use deadly force, and there was evidence (including by his own admission) that Sago shot the victim three times in the back. *Id.* at 1162–63. The court noted that it was unlikely the imperfect self-defense instruction would have changed the outcome given that Sago was convicted of first-degree murder despite the second-degree murder instruction, asking "[h]ow likely is it on the facts of this case that the jury would conclude that Mr. Sago premeditated the murder but then in fact decided to kill Mr. Morgan only out of fear?" *Id.* at 1163.

Following affirmance in his direct appeal, Sago moved the district court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. He asserted his counsel was ineffective for several reasons, including that his counsel "conced[ed] guilt against [his] wishes resulting in a failure to subject the prosecution's case to a meaningful adversarial testing process." R. I at 227. The district court analyzed this claim under the *United States v. Cronic* framework, where prejudice to the defendant is presumed when their counsel's performance effectively "fails to subject the prosecution's case to meaningful adversarial testing." 466 U.S. 648, 658–59 (1984). It held that Sago was not entitled to the *Cronic* presumption of

8

prejudice because (1) trial counsel did not completely fail to contest guilt given that he challenged premeditation; and (2) trial counsel made opening and closing statements, cross examined witnesses, requested the second-degree murder instruction, and presented Sago's testimony, so he did not abandon his client or completely fail to participate in the trial proceedings. In a footnote, the district court held that structural error under *McCoy v. Louisiana*, which requires a new trial without harmless error analysis when counsel usurps the defendant's Sixth Amendment right to decide the objectives of his own defense, was not implicated here. 584 U.S. 414, 427–28 (2018). It reasoned *McCoy* wasn't implicated because Sago twice tried to plead guilty to second-degree murder and admitted he shot and killed Morgan during his trial testimony, thus distinguishing the case from the facts of *McCoy*, where the defendant "steadfastly" asserted factual innocence to the charged crimes. R. I at 264 n.7.

The district court then analyzed Sago's motion under *Strickland v. Washington*, the standard two-step framework for ineffective assistance of counsel claims, where the inquiry is first whether counsel's performance was deficient and then whether counsel's deficient performance prejudiced the defendant. 466 U.S. 668, 687 (1984). It found that Sago failed to satisfy either prong of *Strickland*. The district court held the first prong wasn't satisfied because counsel's decision to focus on contesting premeditation

9

rather than pursuing acquittal through self-defense was a sound trial strategy given the lack of evidence that Morgan had a weapon and admission that Sago shot Morgan in the back three times. The district court found that the second *Strickland* prong was not satisfied for the same reasons that this court previously found no prejudice on plain error in the direct appeal.

The district court denied Sago's § 2255 motion, denied a COA, and entered final judgment on April 4, 2025. Sago appealed and filed a pro se brief requesting a COA from this court. The Government did not respond. This court granted a COA for one claim: whether "trial counsel was ineffective for conceding guilt against Mr. Sago's wishes resulting in a failure to subject the prosecution's case to a meaningful adversarial testing process." Doc. 16.

## II

On appeal, Sago's primary argument is that his trial counsel committed structural error under *McCoy* when he conceded Sago's guilt to second-degree murder at trial. He argues in the alternative that his counsel was ineffective for the same reason and that he can demonstrate prejudice pursuant to *Strickland*. Additionally, he asserts that the district court abused its discretion by not holding an evidentiary hearing on his motion and, finally, that his trial counsel was ineffective in not requesting an

10

instruction for imperfect self-defense. A COA was granted on only one issue, so prior to our analysis we must determine whether the arguments Sago raises are within its scope. *See Fields v. Gibson*, 277 F.3d 1203, 1216 n.8 (10th Cir. 2002) ("'[A]ppellate review of the habeas denial is limited to the specified issues' in the certificate of appealability." (quoting *Ramsey v. Bowersox*, 149 F.3d 749, 759 (8th Cir. 1998) (alteration in original))).

The COA was granted on the issue of whether "trial counsel was ineffective for conceding guilt against Mr. Sago's wishes resulting in a failure to subject the prosecution's case to a meaningful adversarial testing process." Doc. 16. Sago's arguments regarding *Strickland* error, the evidentiary hearing, and the imperfect self-defense instruction are beyond the scope of the COA so will not consider them. The more difficult question is whether the COA encompasses Sago's argument regarding *McCoy* structural error.

The COA's language mirrors that of *Cronic*, 466 U.S. 648. In *Cronic*, the Supreme Court held that counsel's failure to "subject the prosecution's case to meaningful adversarial testing" was a "denial of [a defendant's] Sixth Amendment rights" such that prejudice to the defendant should be presumed. *Id.* at 659–60. And the district court's order denying Sago's § 2255 motion primarily analyzed counsel's concession of Sago's guilt to second-degree murder under *Cronic*.

11

Sago's briefing on appeal, however, argues structural error primarily under *McCoy*, not *Cronic* error. *McCoy* error, where a harmless error analysis is not undertaken at all, is separate from *Cronic* error. *See McCoy*, 584 U.S. at 426–27. *McCoy* was decided in 2018 and prior to that, this circuit analyzed the "admission by counsel of his client's guilt to the jury" without authorization under *Cronic. See, e.g.*, *United States v. Williamson*, 53 F.3d 1500, 1511 (10th Cir. 1995). Therefore, the COA in this case can be read narrowly to encompass only *Cronic* error or broadly to encompass both *Cronic* and *McCoy* error.

There is no need to dwell on the breadth of the COA's language, however, because Sago's counsel requested at oral argument that we exercise our discretion to expand the COA so as to consider both *McCoy* and *Cronic* errors. We will exercise our discretion to do so and proceed by analyzing Sago's arguments under *McCoy* and then under *Cronic. See Honie v. Powell*, 58 F.4th 1173, 1183 (10th Cir. 2023) (This court has "authority 'to expand the COA to cover uncertified, underlying constitutional claims asserted by an appellant.'" (quoting *United States v. Shipp*, 589 F.3d 1084, 1087–88 (10th Cir. 2009))).

For a denial of a § 2255 motion, we generally review the district court's factual findings for clear error and conclusions of law de novo. *United States v. Aguayo-Montes*, 169 F.4th 1205, 1209 (10th Cir. 2026). "Where, as here, the

12

district court did not hold an evidentiary hearing, but rather denied the motion as a matter of law upon an uncontested trial record, our review is strictly de novo." *Id.* (alterations accepted) (quoting *United States v. Barrett*, 797 F.3d 1207, 1213 (10th Cir. 2015)).

## A

Sago argues that his trial counsel's concession that the evidence supported a second-degree murder charge amounted to a usurpation of his autonomy constituting structural error under *McCoy*.[1] Sago asserts that he

---

[1] There seems to be an open question whether *McCoy* error, like ineffective assistance of counsel claims, can only be brought via postconviction review or if, like other claims of structural error, it should be raised on direct appeal to be preserved and benefit from automatic reversal. Ineffective assistance of counsel claims are usually dismissed on direct appeal to allow for the development of factual support, including trial counsel's explanation for his or her actions. *United States v. Poterbin*, 162 F.4th 1254, 1265–66 (10th Cir. 2025). For structural error, the general rule is that when it is unpreserved and raised first in postconviction proceedings as an ineffective assistance of counsel claim, "courts must determine whether the petitioner needs to show actual prejudice–as is required under *Strickland*–or whether automatic reversal is warranted–the remedy used for structural errors." *Meadows v. Lind*, 996 F.3d 1067, 1076 (10th Cir. 2021). This may occur when trial counsel fails to object to a structural error before a lower court (*e.g.*, lack of a public trial) and therefore implicates considerations underlying waiver doctrine. *Id.*

We do not answer this question here but observe that even if Sago's *McCoy* claim is unpreserved, a showing of actual prejudice under *Strickland* on postconviction review would not be appropriate given the Supreme Court's express language stating that *Strickland* does not apply to *McCoy* claims. *See McCoy*, 584 U.S. at 426–27; *see also United States v. Felicianosoto*, 934 F.3d 783, 787 (8th Cir. 2019) (doubting that a defendant who proves *McCoy* error in a postconviction posture would be required to show prejudice).

"repeatedly asked defense counsel before and during trial to request an instruction on [the] lesser included defense" of imperfect self-defense and that "defense counsel's strategy conceding guilt to second degree murder and the other charges was against [his] wishes and unauthorized." Op. Br. at 18.

When "a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence." *McCoy*, 584 U.S. at 426 (discussing how *Strickland* and *Cronic* do not apply). "Violation of a defendant's Sixth Amendment-secured autonomy ranks as [structural error]" that "is not subject to harmless-error review." *Id.* at 427. "[C]ounsel's admission of a client's guilt over the client's express objection is error structural in kind" because it "blocks the defendant's right to make the fundamental choices about his own defense." *Id.* at 427–28. This "free-standing autonomy claim" does not encompass "strategic disputes about whether to concede an element of a charged offense." *United States v. Holloway*, 939 F.3d 1088, 1101 n.8 (10th Cir. 2019) (quoting *McCoy*, 584 U.S. at 426); *see also Crawford v. Mississippi*, 146 S. Ct. 33, 38 (2025) (mem.) (Sotomayor, J., dissenting) ("'Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against him, or reject the assistance of legal counsel despite the defendant's own inexperience,' so too may a defendant 'insist on maintaining his innocence.' That is because

14

'these are not strategic choices about how best to *achieve* his objectives' but rather 'choices about what his objectives in fact *are*.'" (alterations accepted) (quoting *McCoy*, 584 U.S. at 422)).

In *McCoy*, the defendant continuously and "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." 584 U.S. at 417. Specifically, he (1) pleaded not guilty; (2) told his counsel not to make a concession of guilt even after being advised it might save him from the death penalty; (3) testified to his complete innocence and asserted an alibi; (4) tried to terminate representation when counsel would not comply with his desire not to concede guilt; (5) protested contemporaneously to his counsel's concession of guilt during opening statements, saying his counsel was selling him out; and (6) moved for a new trial, arguing it was error to allow his counsel to concede guilt. *Id.* at 418–20. Contrary to the defendant's express wishes, his counsel told the jury that he "committed three murders. . . . [H]e's guilty." *Id.* at 417 (alterations in original). The Supreme Court held that such an admission was an "error structural in kind" and that the defendant "must . . . be accorded a new trial without any need first to show prejudice." *Id.* at 427–28.

Here, Sago points to nothing in the record that indicates he disagreed with or objected to his counsel's trial strategy contemporaneously. He did not maintain his innocence throughout the entirety of the proceedings,

15

protest his counsel's statements during trial or otherwise to the district court, or attempt to fire his counsel or obtain new representation. In this way, the facts of this case are less like *McCoy* and more like those of *Florida v. Nixon*, where the Supreme Court held that cases where a defendant challenges his counsel's strategic concession of guilt that occurred without the defendant's *express* objection or consent should be analyzed under the *Strickland* standard. 543 U.S. 175, 178–79, 189 (2004) ("[W]hen a defendant, informed by counsel, neither consents nor objects to the course counsel describes as the most promising means to [achieving his defense goals], counsel is not automatically barred from pursuing that course."). While Sago asserts in these postconviction proceedings that he never agreed to his counsel's concession of guilt, there is no indication he "object[ed] to th[is] course" when it was ongoing. *Id.* at 178. Sago's autonomous right to decide the objectives of his defense was not usurped by his counsel.

Furthermore, there *is* indication in the record that Sago affirmatively agreed with his counsel's trial strategy and presentation to the jury. Sago entered into a Rule 11(c)(1)(C) agreement and tried to plead guilty to second-degree murder, although the district court declined to accept the agreement. His counsel then moved the district court to reconsider its rejection of the plea agreement at the pre-trial hearing that occurred just prior to trial. While Sago ultimately withdrew his guilty plea and proceeded to trial on a

16

not guilty plea, his two attempts to plead guilty at least signal that his mindset regarding the goals of his defense was not to assert absolute innocence. Rather, Sago's goal was to mitigate his sentencing exposure after admitting culpability, which is aligned with the strategy his counsel pursued during trial. This is even more apparent considering Sago himself admitted on the witness stand during direct and cross examinations that he shot and killed Morgan from inside his vehicle and didn't testify on direct to seeing Morgan armed.

Indeed, unlike the defendant in *McCoy*, Sago at no point maintained factual innocence of the actions underlying the charged crime. Rather, his own stated goal from trial through these postconviction proceedings was mitigation of first-degree murder – though Sago wished to mitigate using imperfect self-defense rather than only contesting premeditation. Thus, the record supports the conclusion that Sago's counsel honored Sago's choice about what his objectives were and pursued a trial strategy consistent with those objectives. Sago may now voice post hoc disagreement with his counsel's strategy, or perhaps even consider his counsel's performance deficient, but this present grievance is not redressable under *McCoy*. *See Holloway*, 939 F.3d at 1101 n.8.

Here, Sago never insisted on maintaining his innocence of shooting Morgan. To the contrary, he admitted to the shooting during his testimony.

17

What this record shows is that Sago and his counsel wanted to pursue a strategy of mitigation and that Sago never contemporaneously objected to counsel's strategic choices to achieve that objective at trial. Sago now asserts that he disagreed with counsel's strategy and didn't know his counsel was going to concede his guilt to second-degree murder. But *McCoy* requires more, to wit, at least some contemporaneous indication of such a disagreement in the record. No structural *McCoy* error occurred here. We turn next to Sago's argument that his counsel erred under *Cronic*.

**B**

Sago appears to briefly argue that the district court erred by not applying the *Cronic* presumption of prejudice to his claim that his counsel erred by conceding Sago's guilt to second-degree murder. "In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland* 466 U.S. at 692. The "situations when *Strickland* does not apply such that a court may presume prejudice without inquiring into counsel's performance" include "a breakdown in the adversarial process" in which "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Hooks v. Workman*, 689 F.3d 1148, 1185–86 (10th Cir. 2012) (internal quotations marks and citations omitted).

18

Sago does not argue that his counsel completely failed to subject the Government's evidence and presentation to adversarial testing beyond the concession to second-degree murder. On our review of the record, we find that Sago's counsel did not completely fail to subject the Government's case to the adversarial process. Sago's counsel did not concede his guilt to the charged crime of first-degree murder, challenged the premeditation element at trial, requested a lesser included offense instruction for second-degree murder, vigorously cross examined witnesses, presented Sago's testimony in his defense, and made opening and closing arguments, including briefly arguing in support of Sago's assertion of self-defense. We have previously held that the *Cronic* presumption of prejudice is not applicable under similar circumstances and do again on this record. *See Hooks*, 689 F.3d at 1186.

In sum, Sago fails to establish either *McCoy* or *Cronic* error, and a *Strickland* analysis is outside the scope of the COA granted in this case.

AFFIRMED. Sago's motion to supplement the brief in support of his motion for a COA, Doc. 13, is DENIED as moot.